## UNITED STATES DISTRICT COURT
## SOUTHERN DISTIRCT OF FLORIDA
## MIAMI DIVISION

### CASE NO.:

GARY CATENAC and AYANA KNOWLES, individually and as representatives of a class of participants and beneficiaries on behalf of the Lennar Corporation 401(K) Plan,

        Plaintiffs,

vs.

LENNAR CORPORATION,

        Defendant.

**CLASS ACTION COMPLAINT**

Demand for Jury Trial

## INTRODUCTION

On behalf of the Lennar Corporation 401(k) Plan ("Plan"), Gary Catenac and Ayana Knowles ("Plaintiffs"), files this Class Action Complaint against Lennar Corporation, ("Lennar" or "Defendant"), for breaching its fiduciary duties of prudence in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1. Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held ***$7.9 trillion*** in employer-based defined contribution retirement plans as of March 31, 2020, of which ***$5.6 trillion*** was held in

401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

2.      In a defined contribution plan, "'participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance account contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, employers have little incentive to keep costs reasonable or to closely monitor plans to ensure every investment offered through a plan is prudent.

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers who sponsor retirement plan. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

4.      Because retirement savings in defined contribution plans grow and compound over the course of employee participants' careers, poor investment performance and excessive fees can and unfortunately often do ***dramatically*** reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and can result in ***vast*** differences in the amount of savings available at retirement. As the Supreme Court has explained,

"[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

5.      The U.S. Department of Labor has noted that a ***1% higher level of fees*** over a 35-year period makes a ***28% difference*** in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

6.      Plaintiffs are Plan participants. As of December 31, 2020 (the last year Lennar filed statutorily required Form 5500 information about the Plan with the Department of Labor), the Plan had $1,224,580,004 in assets (more than $1.2 billion) and 12,958 participants with account balances. The Plan is one of the largest plans in the country. It is considered a jumbo or mega plan.

7.      The Plan has tremendous leverage to secure low fees and excellent investment options for Plan participants and beneficiaries. Instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendant caused the Plan to pay excessive fees and compensation to Prudential Retirement Insurance and Annuity company ("Prudential").[1] In short, Defendant violated its ERISA's duty of prudence in three important ways. ***First***, Defendant caused the Plan and its participants to pay Prudential excessive and unreasonable fees for administrative

---

[1] Effective April 1, 2022, Empower, a division of Great-West Life & Annuity Insurance Company, acquired the retirement business of Prudential. The Plan, in communications with participants uses references to "Prudential" and "Empower" interchangeably. For clarity, in this Complaint Plaintiff uses only the term "Prudential" to reference Prudential and/or Empower.

services. Defendant caused the Plan and its participants to pay Prudential more than triple the market rate for administrative services. This breach caused the plan losses of at least $450,000 per year during the relevant time period. ***Second***, Defendant selected and retained on the Plan investment menu the Prudential Stable Value Fund. The Prudential Stable Value Fund consistently underperformed industry benchmarks; it underperformed stable value funds offered by other investment companies; and it underperformed virtually identical stable value funds offered by Prudential to other retirement plans. Worse still, Defendant allowed Prudential to steer Plan participants into the imprudent Prudential Stable Value Fund by allocating Plan participant money into the Prudential Stable Value Fund when Plan participants did not direct their money to be invested elsewhere. As a result, there is more Plan participant money in the imprudent Prudential Stable Value Fund than in any other investment offered by the Plan. As of December 31, 2020, there was ***$206,417,339*** (over 200 million dollars) invested in the imprudent Prudential Stable Value Fund. Most Plan participants invested in the Prudential Stable Value Fund lost money relative to inflation. Prudential, on the other hand, was compensated by the Plan at least $5,000,000 per year during the relevant time period for investment in the Prudential Stable Value Fund. Defendant never undertook any reasonable investigation into the performance of the Prudential Stable Value Fund. Defendant never took any prudent measures to discover the actual compensation Prudential was pocketing from the Plan via the Prudential Stable Value Fund. Consequently, not only have Plan participants been directly paying excessive fees to Prudential for administrative services but Prudential has also been receiving wildly

excessive compensation through the massive investment in its stable value fund. This breach caused Plan losses of at least $4,000,000 per year during the relevant time period.

***Third***, whenever a Plan participant deposits or withdraws money from his/her Plan account, the money is transferred to a clearing account owned by Prudential. The money is in Prudential's possession, usually for several days while, until eventually the money is directed to wherever Plan participants initially requested. Prudential invests and earns income on the Plan participant money while it is in its clearing account. Defendant agreed that Prudential could keep all of the income and interest earned on Plan participant money while it is in Prudential's account.  This income is referred to as "float" income. There is nothing *per se* imprudent about Defendant allowing Prudential to keep the float income. Plaintiffs are not making this allegation. Plaintiffs do allege however, Defendant never monitored, tracked, negotiated, or factored the amount of float income that Prudential was receiving from Plan participants when assessing Prudential's compensation from the Plan. In essence, Defendant allowed Prudential to make money with Plan participant money without any corresponding benefit, and Defendant was clueless to the amount of money Prudential was taking from Plan participants. This is a class breach of the duty of prudence. The breach caused the Plan losses of roughly $200,000 per year during the relevant time period.

8.      To the extent Defendant made any attempt to accurately identify the fair market value of the Plan's expenses, to prudently monitor and review the Plan's investment options, or identify the actual compensation received by Prudential from the Plan and its participants, Defendant employed flawed and ineffective processes, which

failed to ensure that expenses charged to Plan participants were reasonable and failed to ensure the compensation received by Prudential from Plan participants was reasonable.

9.      Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary of a billion-dollar retirement plan and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

10.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

11.     This Judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because Lennar maintains its corporate headquarters in this District.

## THE PLAN

12.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

13.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

14.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

15.     Eligible current and former employees of Lennar are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former

Lennar employees.  The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by Defendant.

16.    In theory, Defendant determines the appropriateness of the Plan's investment offerings, monitors investment performance, and reviews total plan and fund costs each year. Defendant failed to do so.

## THE PARTIES
### *Plaintiffs & Standing*

17.    Plaintiffs are participants in the Plan under 29 U.S.C. §1002(7).

18.    Gary Catenac is a resident of Florida. He was employed by Defendant from 2013 to 2021. He was and is a member of the Plan. Through his individual account in the Plan, he invested in the Prudential Stable Value Fund. He also paid Prudential excessive administrative fees during the relevant time period.

19.    Ayana Knowles is a resident of Georgia. She has been employed since March 1, 2017.  She is a member of the Plan. Through her individual account in the Plan, she invested in the Prudential Stable Value Fund. She also paid Prudential excessive administrative fees during the relevant time period.

20.    In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

21.    The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. Indeed, if Defendant

acted prudently, it would immediately correct the flaws identified in this Complaint to stop losses from continuing to occur to the Plan and its participants.

22.     Section 1132(a)(2) authorizes any Plan participant to sue derivatively as a representative of the Plan to seek relief on behalf of the Plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and the Plan remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

23.     To the extent the Plaintiffs must also show individual injuries, even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan, were invested in the stable value fund, were denied an opportunity to invest in a prudent stable value fund and were injured by Defendant's unlawful conduct.

24.     To establish constitutional Article III standing, Plaintiffs need only show an adequate injury flowing from Defendant's imprudent decisions or failures. Plaintiffs have standing because the challenged conduct, including Defendant's actions resulting in Plaintiffs paying excessive administrative fees, and excessive compensation to Prudential, which caused Plaintiffs' financial losses and affected all Plan participants in the same way.

25.     For example, Plaintiffs' individual accounts in the Plan suffered losses because each Plaintiffs' account was assessed an excessive amount for administrative

fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

26.     Not only that, Plaintiffs and all participants in the Plan suffered financial harm as a result of Defendant's inclusion of the imprudent Prudential Stable Value Fund and deprived Plan participants of the opportunity to invest in a prudent stable value fund and to grow their retirement savings by investing in a prudent stable value fund with reasonable fees. All participants continue to be harmed by the ongoing inclusion of Defendant's fiduciary breaches.

27.     As a result of Defendant's imprudence, Plaintiffs and Plan participants are entitled to restitution in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

### *Defendant*

28.     Lennar is the Plan sponsor and a statutory fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) represents to Plan participants that it is a fiduciary of the Plan.

29.     Lennar sends Plan participants annual notices wherein Lennar acknowledges that it is Plan fiduciary and that it is Lennar's fiduciary responsibility to

review compensation paid to third parties (Prudential) and the costs for each investment in the Plan.

30.     Lennar was established in 1954 by Leonard Miller and Arnold Rosen. Since its inception, Lennar has maintained its corporate headquarters in Miami, Florida. At all relevant times, Lennar has maintained its corporate headquarters at 700 NW 107th Avenue, Miami, Florida 33172.

## CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[2] All persons, who were participants in or beneficiaries of the Plan, at any time between September 30, 2016, and the present (the "Class Period").

32.     The members of the Class are so numerous that joinder of all members is impractical. According to the Plan's 2020 Form 5500 filed with the U.S. Department of Labor, there were 12,958 Plan participants with account balances, as of December 31, 2020.

33.     Plaintiffs' claims are typical of the claims of Class members. Like other Class members, Plaintiffs participated in the Plan and suffered injuries because of Defendant's imprudence. Defendant treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant

---

[2] Plaintiffs reserve the right to revise the proposed class definition in his motion for class certification or subsequent pleadings in this action.

as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

34.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendant is a fiduciary of the Plan;
>
> B.     Whether Defendant breached its fiduciary duties of prudence by engaging in the conduct described herein;
>
> C.     Whether Defendant failed to adequately monitor Prudential's compensation to ensure the Plan was being managed in compliance with ERISA;
>
> D.     The proper form of equitable and injunctive relief; and
>
> E.     The proper measure of all relief.

35.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

36.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate

actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

37.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANT'S FIDUCIARY BREACHES

38.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

39.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

40.     As described above, Defendant was (and still is a) fiduciary of the Plan because Lennar:

      A.      is so named; and/or

      B.      exercised authority or control respecting management or disposition of the Plan's assets; and/or

      C.      exercised discretionary authority or discretionary control respecting management of the Plan's fess, expenses, and compensation paid to Prudential; and/or

      D.      has discretionary authority or discretionary responsibility in the administration of the Plan.

41.     As a fiduciary, Defendant was/is required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan's fees and expenses, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

42.     "In deciding whether and to what extent to invest in a particular investment, ***a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income***. A decision to make an investment may not be influenced by non-economic factors unless the investment, ***when judged solely on the basis of its economic value to the plan***, would be equal or superior to alternative investments available to the plan." *U.S. Dep't of Labor ERISA Adv. Op*. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

43.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

44.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

45.     During the Class Period, Defendant did not act prudently or in the best interests of the Plan's participants.

46.     During the Class Period, Defendant failed to have a proper system in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for administrative services. Defendant also caused the Plan and its participants to pay excessive compensation to Prudential via its stable value fund and receipt of float income. Not only did Defendant fail to have a proper system in place, but Defendant failed to control fees and compensation as a prudent fiduciary would have done.

47.     As set forth in detail below, Defendant breached fiduciary duties to the Plan and its participants and beneficiaries, and is, therefore, liable for their breaches under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## **SPECIFIC ALLEGATIONS**
### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

48.     Wasting Plan participant retirement savings is imprudent. "In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

49.     "The Restatement...instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to

consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[3]

50.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[4] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors, whether due to poor performance, high fees, or both.

51.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and to "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

52.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[5] "Any costs not paid by

---

[3] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 27, 2022).

[4] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited September 27, 2022).

[5] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited September 27, 2022).

the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

53.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from services like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[6]

### *Defendant Failed to Monitor or Control the Plan's Administrative Expenses*

54.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

---

[6]  Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited September 11, 2022).

55.    Virtually all recordkeepers in the marketplace offer nearly identical services.

56.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level (*i.e.*, identical) services. As a result of such competition, vendors vigorously compete for business by offering the best price when prudent fiduciaries request or negotiate the best price. But absent prudent fiduciaries requesting or negotiating reasonable prices for recordkeeping services, recordkeepers often demand excessive and unreasonable fees for their services – on the theory that if imprudent fiduciaries are willing to pay excessive and unreasonable fees for recordkeeping, so much the better for the recordkeepers who pocket the fees – and the onus is on the fiduciaries to negotiate fair pricing, not on the recordkeepers to do so.

57.    According to a study conducted by Deloitte Consulting LLP for the Investment Company Institute, on average, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. *See Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013: A study assessing the mechanics of the 'all-in' fee*, at 17 (Aug. 2014) (stating: "recordkeeping, administrative and financial advice fees made up 18% of total fees").[7]

58.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because

---

[7]Available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-cons-401k-fee-study-2013-082014.pdf (last visited Oct. 24, 2020).

recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

59.     Recordkeeping expenses can either be paid directly on a per-participant basis. Recordkeeping expenses can also be paid indirectly by discretely, in many instances almost imperceptibly, taking money from Plan participants' investment balances. This is a practice known as revenue sharing (the name is a misnomer because recordkeepers surreptitiously take money from participant investments regardless of whether the investments increase in value of decease in value. There is no actual "revenue sharing.")

60.     Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiffs are not making a claim against Defendant merely because they used revenue sharing to pay Prudential for recordkeeping. If Defendant makes this argument in a motion to dismiss – the argument is disingenuous.

61.     When revenue sharing is left unchecked, however, it can be ***devastating*** for Plan participants. "At worst, revenue sharing is a way to hide fees participants pay to invest in retirement plans. Nobody sees the money change hands, and very few understand what the total investment expense pays for – or how much they are actually paying for recordkeeping when the direct expenses and the indirect expenses (revenue sharing) are totaled. Defendant here does not disclose in any meaningful way to Plan participants how much Plan participants pay in revenue sharing. This is likely because Defendant itself does not even know what Plan participants pay in revenue sharing. Revenue sharing is a deceptive construct designed to milk large sums of money out of

large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees."[8]

62.     Because revenue sharing payments are asset based, ***they bear no relation to a reasonable recordkeeping fee.*** They can (and frankly are designed) to provide excessive compensation to recordkeepers because as Plan assets increase so do the fees. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increases the recordkeeping fees that recordkeepers pocket from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the ***fees skyrocket as more money flows into the Plan.***

63.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an

_____

[8]  Available  at:  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees  (last  visited September 27, 2022).

account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

64.      Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

65.      Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify ***all fees***, including direct compensation indirect compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

66.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

67.     Defendant failed to prudently manage and control the Plan's recordkeeping fees by failing to undertake any of the aforementioned steps.

68.     More specifically, Prudential has been the Plan's recordkeepers during the Class Period.

69.     According to Plan documents obtained thus far, including statutorily required Form 5500 disclosures made by the Plan to the Department of Labor, Defendant has failed to undertake an RFP during the class period. If Defendant had undertaken an RFP to compare Prudential's fees with those of others in the marketplace, Defendant would have recognized that Prudential's direct fees for recordkeeping services during the Class Period have been (and remain) unreasonable and excessive.

70.     From 2017 to 2020 the direct annual recordkeeping per participant compensation that Prudential received from Plan participants as disclosed in the Plan's Department of Labor annual 5500 disclosures was as follows:

| Year | Direct Recordkeeping Compensation |
|------|-----------------------------------|
| 2017 | $41.10 |
| 2018 | $48.41 |
| 2019 | $53.19 |
| 2020 | $52.86 |

71.     Defendant disclosed to Plan participants in the Plan's Summary Plan Description, dated January 1, 2021, that a "Quarterly Administrative Fee" in the amount of $25.00 per quarter, or $100.00 per year may be taken directly from Plan participants with account balances in excess of $2,500.00 by Prudential for recordkeeping fees.

72.     These amounts do not include indirect compensation that Prudential receives from the Plan via revenue sharing, float, spread, etc. By comparison to other plans, even Prudential's direct fees are excessive and unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan) and provides the average recordkeeping and administration cost (through direct compensation) is $12 per participant. 401k Averages Book at 95.

73.     Just recently, in *Moitoso v. FMP LLC*, the parties involved in that case came to an agreement that if Fidelity Management Trust Company (one of the largest

recordkeepers for retirement plans) were a negotiating recordkeeping fees at arm's length for a plan of $1 billion or more, that recordkeeping costs would range from $14 to $21 per person per year.[9]

74.     The direct compensation Prudential received from the Plan for recordkeeping was excessive. Moreover, Prudential did not receive only the direct compensation set forth above—it received far more compensation for recordkeeping and other administrative services through indirect compensation, including revenue sharing payments.

75.     As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

76.     According to Plan's Department of Labor Form 5500's, Plan participants paid to Prudential both disclosed direct payments for recordkeeping services and *undisclosed* payments for recordkeeping services.

---

[9] *Moitoso v. FMR LLC,* Civil Action 18-12122-WGY (US Dist. of Mass.) decided Mar 27, 2020.

77.     Specifically, the Plan paid substantial amounts through revenue sharing arrangements with the various fund families through which the Plan offers investment options. *See* Form 5500 for 2020, Schedule C (reporting only that Prudential received indirect compensation without disclosing the amounts of such compensation). As discussed below, the indirect compensation Prudential received derives not only from revenue sharing but also from float and spread compensation. Defendant has breached its fiduciary duties of prudence by allowing Prudential to pocket excessive fees from throughout the Class Period.

78.     As noted above, Defendant agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a Prudential clearing account.

79.     Defendant agreed Prudential could keep all of the interest and investment related revenue earned on Plan participant money while participant money is in Prudential's clearing account (often for several days). This is another form of indirect compensation that Prudential receives from the Plan. Because there is over $1.2 billion in the Plan, the float compensation Prudential receives from the Plan is substantial. The Plan's 2020 5500 provides that there were $25,026,970 in contributions to the Plan in 2020, and $116,575,779 in expenses, or money paid out of the Plan in 2020. Thus, in 2020 alone, Prudential earned interest and investment related revenue on more than $141,000,000 ($141 million) of Plan participant money while the money was in Prudential's account. But Defendant did not take any measures to understand, account for, negotiate, limit, or end altogether this compensation. A prudent fiduciary is required

-25-

to do so under ERISA. Defendant's imprudence caused the Plan losses. Had prudential earned 1% on the $141,000,000 it would have pocketed $1,410,000 ($1.4 million) in 2020 alone from float alone. The numbers are staggering.

80.     Defendant breached its fiduciary duties of prudence by allowing Prudential to receive float compensation from Plan participants without even knowing the amount of such compensation or factoring in the amount of such compensation into the total amount of compensation Defendant agreed Lennar could take from Plan participant retirement savings.

81.     The total compensation Defendant allowed the Plan to pay Prudential is far greater than recognized reasonable compensation for a plan with more than $1.2 billion in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower plan administrative expenses in the marketplace as a whole, the Plan could have obtained administrative services that were comparable to or superior to the services provided to the Plan by Prudential but at a fraction of the cost to Plan participants.

82.     Prudential performs task for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.) The services that Prudential provides are nothing out of the ordinary, and a prudent fiduciary would have observed the excessive compensation paid to Prudential and taken corrective action.

83.     Looking at administrative costs for other plans of a similar size as of 2019/2020 shows that the Plan was paying higher fees than its peers too – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. The chart[10] below analyzes a few well managed similar plans:

| Name of Plan | Total Number of Participants | Dollar Value of Plan Assets | Total Reported Recordkeeping and Administrative Service Costs | Recordkeeping and Administrative Service Costs on a Per-Participant Basis[11] |
|---|---|---|---|---|
| Sutter Health 403(b) Savings Plan | 67,149 | $5,565,602,878 | $1,719,469 | $25 |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 48,263 | $4,516,280,538 | $1,758,659 | $27 |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 |
| IQVIA 401(k) Plan | 25,083 | $2,456,483,287 | $439,126 | $17.50 |

84.     Thus, Defendant should have been able to negotiate a _**total**_ recordkeeping cost anywhere from $14 per participant to $30 from the beginning of the Class Period

---

[10] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019/202, which are the most recent years for which many plans' Form 5500s are currently available

[11] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www        .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2019-instructions.pdf.

to the present. Plan participants are paying Prudential in excess of $250 via direct and indirect forms of compensation.

85.     In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower administrative expenses in the marketplace as a whole, Defendant could have obtained for the Plan administrative services that were comparable to or superior to the typical services provided by Prudential at a lower cost.  Defendant failed to do so and, as a result, violated its fiduciary duties under ERISA.

### ***Prudential Stable Value Fund***

86.     Stable value funds are a staple of defined contribution plans. They provide liquidity, principal protection, and consistent returns over time.

87.     Stable value funds are intended to provide the liquidity and principal protection of a money market fund, but with higher returns that are closer to short-intermediate bond funds.

88.     Stable value funds are able to generate these higher returns because 401(k) participant behavior provides a stable amount of money to be invested in the account over time. This enables funds providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by guaranteeing the funds transacts at face value. Stable value funds also "stabilize" the returns through the use of an imbedded

formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with bond funds.[12]

89.     In most cases, stable value products use a guaranteed investment contracts also known as "GICS" or "wraps" that have specialized risk and return characteristics.[13] In the vast majority of cases, stable value funds are not mutual funds and are typically structured as: (1) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic account.

90.     Large plans often offer synthetic accounts, which are the least risky because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.[14]

91.     Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider. As a result, they offer higher crediting rates. Separate account products, such as the Prudential PPSA, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently must offer the highest rates.

---

[12] *See Stable Value Fund v. Money Market Fund,* Financial Web describing difference between stable value funds and money market funds, available at http://www.finweb.com/investing /stable-value-fund-vs-moeny-market-fund.html#axzz44-EaLfQnQ.

[13] *See* https://stablevalue.org/knowledge/faqs/question/what-are-gics-and-wraps.

[14] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relied on both the value of the associated assets and the financial backing of the wrap provider.

92.     Following the high-profile failure or near failure of a number of stable value providers during the credit crisis of 2008-09, the trend among fiduciaries is to avoid general account stable value funds because of credit risk concerns.

93.     During the Class Period, the Plan offered one stable value product, the Prudential Stable Value Fund.

94.     The Prudential Stable Value Fund is a general account product established pursuant to a contract between Lennar and Prudential. The invested funds are deposited by Prudential into its general account.

95.     Thus, the Prudential Stable Value Fund is subject to a single entity credit risk, of Prudential, the issuer of the contract.

96.     The crediting rate – set in advance by Prudential at its sole discretion – is not tied to the performance of the assets deposited into the Principal Stable Value Fund.

97.     Because the crediting rate is set in advance, Defendant has both the opportunity and the duty to evaluate the investment in advance.

98.     The fact that the funds are deposited into Prudential's general account enables Prudential to earn a "spread" equal to the difference between the crediting rate and the returns earned by Prudential from the general account funds.

99.     Prudential earns a "spread" equal to the difference between the 0.00-2.34%. 2.08%. The average return for Plan participants invested in the Prudential Stable Value Fund is 1.57% over the past one year, and 2.08% over the past 3 years. The average return over the past month is .11%.

100.    Defendant does not require Prudential to provide information regarding the performance of the general account into which the Plan participants' funds were invested.

101.    In addition, Defendant does not require Prudential to disclose the "spread" to either the Plan or to the participants.

102.    Thus, neither Defendant nor the Plan participants know the "spread" on Plan participant money being collected by Prudential.

103.    Upon information and belief, the spread was consistently 400 basis points or more.

104.    That is, Prudential is collecting, and participants are paying, a 4% fee to obtain a return of .11%-2.08% on their investments.

105.    Defendant's 403(b) Disclosure fails to provide benchmark information for the Prudential Stable Value Fund too. As a result, participants cannot evaluate the performance of the Prudential Stable Value Fund relative to other stable value funds that are available in the marketplace.

106.    The Prudential Stable Value Fund contractually allows Prudential to pay Plan participants invested in the fund no return. It is a "heads I win, tails you lose" investment vehicle for Prudential.

107.    Lennar did not have a viable methodology for monitoring the cost or performance of the Prudential stable Value Fund. Not only were comparable products available from other providers (New York Life, Vanguard, TIAA, Putnam, etc.) with higher crediting rates, but virtually identical products were available from Prudential

itself with higher crediting rates and lower spread fees. In fact, the Prudential Stable Value Fund consistently returned 200 basis points less than the ***very same*** type of fund offered by Prudential to other similarly situated retirement plans. By way of ***one example***, attached hereto as Exhibit A is Fact Sheet for the "Lennar" Prudential Stable Value Fund. The Fact Sheet shows the fund has a current crediting rate of 1.28%. Attached hereto as Exhibit B, is a Fact Sheet for a Prudential stable value fund generally available to the public. Exhibit B shows essentially the same fund is being offered with a crediting rate of 2.43% -- or nearly double the crediting rate of what is in the Plan.

108.    Lennar did not have to scour the marketplace to find a better performing fund, it simply had to make an effort, which it failed to make, to determine whether the same fund was available at a lower cost. Fact sheets showing the available crediting rates of market rate Prudential stable value funds (Exhibit A) and similar products from other providers were readily available had Lennar exercised even a minimal amount of due diligence.

109.    There is more than $200,000,000 ($200 million) of Plan participant money invested in the Prudential Stable Value Fund. There is more Plan participant money in the Prudential Stable Value Fund than any other investment on the Plan's investment menu.

110.    The amount of money in the Prudential Stable Value Fund is a direct result of Defendant's use of a Prudential asset allocation service called "GoalMaker."

111.    GoalMaker was represented by Defendant to participants as a service that would guide and assist participants to a model portfolio of investments available in the

Plan and then rebalance accounts quarterly to ensure participants investment portfolios stay on target.

112.    But, in reality, GoalMaker is used to funnel money into Prudential proprietary investment products. Hence, the reason why there is more than $200 million of Plan participant money invested in the Prudential Stable Value Fund. Indeed, in some instances, GoalMaker allocates 44% of all contributions in Plan participants' accounts into the Prudential Stable Value Fund.

113.    To make matters worse, Defendant selected GoalMaker to be the Qualified Default Investment Alternative ("QDIA") for the Plan. That means whenever a Plan participant does not affirmatively elect how to invest new contributions to his/her account, GoalMaker will allocate the funds to investments selected by GoalMaker, primarily, Prudential proprietary funds like the Prudential Stable Value Fund.

114.    There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere. Because the product's performance over a given period is declared six months in advance, the plan fiduciary knows six months in advance what the returns will be.

115.    The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than bond funds. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the Prudential Stable Value Fund, generally continues to perform poorly in a stable manner.

116.    A prudent fiduciary – that is, a fiduciary that monitors the investment, understands the pricing mechanism, and informs itself of the crediting rates and spread fees available in the market – would have known that Prudential's stable value product would underperform and that being a stable value product it would continue to underperform in a stable manner.

117.    A prudent fiduciary would have monitored the investment, understood the pricing mechanism, and informed itself regarding reasonable market rate crediting rates and spread fees.

118.    A prudent fiduciary would have learned that the Prudential Stable Value Fund was under-performing and divested the Plan of the Prudential Stable Value Fund.

119.    The consequence of failing to monitor the stable value product was particularly significant here. Prudential, the stable value provider, was also the investment platform provider and the supplier of GoalMaker, which Prudential applied in a self-dealing manner to steer Plan participants to proprietary Prudential products and products paying kickbacks to Prudential. General account stable value funds can be tremendously profitable for the issuing insurance company because of the spread. The excessive spread in this case resulted in a windfall to Prudential, whose compensation Lennar had a legal duty to monitor, but which duty Lennar failed to discharge in spectacular fashion.

120.    On the basis of the excessive spread fees alone, the Prudential Stable Value Fund was an imprudent investment which should have been removed from the Plan.

## CLAIM FOR RELIEF
### *Breach of ERISA's Fiduciary Duty of Prudence*

121.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

122.    The scope of the fiduciary duties and responsibilities of Lennar includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Lennar is directly responsible for ensuring that the Plan's fees are reasonable, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. In order to do so, Lennar had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses.

123.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

124.    Thus, to state a claim upon which relief can be granted, "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.*

125.    Lennar failed to implement a prudent process of the selection, monitoring, and retention or, as the case may be, removal of the Prudential Stable Value Fund.

126.     Lennar also failed to prudently monitor and control the total compensation Plan participants paid Prudential for administrative services.

127.     Lennar failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

128.     Lennar breached its fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B). Lennar is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duty of prudence and is subject to other equitable or remedial relief as appropriate.

129.     Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1.     Find and declare that the Defendant has breached its fiduciary duties as described above;

2.      Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.      Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to include only prudent investments;

8.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

9.      Certify the Class, appoint the Plaintiffs as class representatives, and appoint their counsel as Class Counsel;

10.     Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11.     Order the payment of interest to the extent it is allowed by law; and

12.     Grant other equitable or remedial relief as the Court deems appropriate.

Dated this 5th day of October, 2022.

                              Respectfully submitted,

                              */s/ Brandon J. Hill*
                              **BRANDON J. HILL**
                              Florida Bar Number: 0037061
                              Direct Dial: 813-337-7992
                              **LUIS A. CABASSA**
                              Florida Bar Number: 053643
                              Direct No.: 813-379-2565
                              **AMANDA E. HEYSTEK**
                              Florida Bar Number: 0285020
                              Direct Dial: 813-379-2560
                              **WENZEL FENTON CABASSA, P.A.**
                              1110 N. Florida Avenue, Suite 300
                              Tampa, Florida 33602
                              Main Number: 813-224-0431
                              Facsimile: 813-229-8712
                              Email: bhill@wfclaw.com
                              Email: lcabassa@wfclaw.com
                              Email: aheystek@wfclaw.com
                              Email: gnichols@wfclaw.com

                              **and**

                              **MARC R. EDELMAN**
                              Florida Bar No. 0096342
                              **MORGAN & MORGAN, P.A.**
                              201 N. Franklin Street, Suite 700
                              Tampa, FL  33602
                              Telephone:  813-223-5505
                              Facsimile:  813-257-0572
                              Email: medelman@forthepeople.com

                              ***Attorneys for Plaintiffs and the Proposed Class***