## UNITED STATES DISTRICT COURT
## SOUTHERN DISTIRCT OF FLORIDA
## MIAMI DIVISION

### CASE NO.:  1:22-cv-23232-KMW

| | |
|---|---|
| **GARY CATENAC, AYANA KNOWLES, FRANK HAMMOND, ALEXANDER OKWALI, and HARRY GARCIA,** individually and as representatives of a class of participants and beneficiaries on behalf of the Lennar Corporation 401(K) Plan, | |
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| **Plaintiffs,** | Demand for Jury Trial |
| **vs.** | |
| **LENNAR CORPORATION,** | |
| **Defendant.** | |

## INTRODUCTION

Pursuant to Fed.R.Civ.P. 15(a)(1)(B), and in accordance with this Court's Order dated December 28, 2022 (*see* Doc. 17), on behalf of the Lennar Corporation 401(k) Plan ("Plan"), Gary Catenac, Ayana Knowles, Frank Hammond, Alexander Okwali, and Harry Garcia ("Plaintiffs"), file this First Amended Class Action Complaint against Lennar Corporation ("Lennar" or "Defendant"), for breaching its fiduciary duties of prudence in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the

Investment Company Institute, Americans held ___$7.9 trillion___ in employer-based defined contribution retirement plans as of March 31, 2020, of which ___$5.6 trillion___ was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

2.      In a defined contribution plan, "'participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance account contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, employers have little incentive to keep costs reasonable or to closely monitor plans to ensure every investment offered through a plan is prudent.

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers who sponsor retirement plan. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

4.      Because retirement savings in defined contribution plans grow and compound over the course of employee participants' careers, poor investment performance and excessive fees can and unfortunately often do ___*dramatically*___ reduce the amount of benefits available when the participant is ready to retire. Over time, even

small differences in fees and performance compound and can result in ***vast*** differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

5.      The U.S. Department of Labor has noted that a ***1% higher level of fees*** over a 35-year period makes a ***28% difference*** in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

6.      Plaintiffs are Plan participants. As of December 31, 2021 (the last year Lennar filed statutorily required Form 5500 information about the Plan with the Department of Labor), the Plan had $1,389,412,073 in assets (more than $1.3 billion) and 14,412 participants with account balances. The Plan is one of the largest plans in the country. It is considered a jumbo or mega plan.

7.      The Plan has tremendous leverage to secure low fees and excellent investment options for Plan participants and beneficiaries. Instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendant caused the Plan to pay excessive fees and compensation to Prudential Retirement Insurance and Annuity company ("Prudential").[1] In short, Defendant violated its ERISA's duty of prudence in three important ways.

---

[1] Effective April 1, 2022, Empower, a division of Great-West Life & Annuity Insurance Company, acquired the retirement business of Prudential. The Plan, in communications with

8.      ***First***, Defendant caused the Plan and its participants to pay Prudential excessive and unreasonable fees for administrative services. Defendant caused the Plan and its participants to pay Prudential more than triple the market rate for administrative services.

9.      ***Second***, Defendant selected and retained on the Plan investment menu the Prudential Stable Value Fund. The Prudential Stable Value Fund consistently underperformed industry benchmarks; it underperformed stable value funds offered by other investment companies; and it underperformed virtually identical stable value funds offered by Prudential to other retirement plans. Worse still, Defendant allowed Prudential to steer Plan participants into the imprudent Prudential Stable Value Fund by allocating Plan participant money into the Prudential Stable Value Fund when Plan participants did not direct their money to be invested elsewhere. As a result, there is more Plan participant money in the imprudent Prudential Stable Value Fund than in any other investment offered by the Plan. As of December 31, 2021, there was $221,543,921 (over 220 million dollars) invested in the imprudent Prudential Stable Value Fund. Most Plan participants invested in the Prudential Stable Value Fund lost money relative to inflation. Prudential, on the other hand, was compensated by the Plan at least $5,000,000 per year during the relevant time period for investment in the Prudential Stable Value Fund. Defendant never undertook any reasonable investigation into the performance of the Prudential Stable Value Fund. Defendant never took any prudent measures to discover the actual

---

participants uses references to "Prudential" and "Empower" interchangeably. For clarity, in this Complaint Plaintiffs use only the term "Prudential" to reference Prudential and/or Empower.

compensation Prudential was pocketing from the Plan via the Prudential Stable Value Fund. Consequently, not only have Plan participants been directly paying excessive fees to Prudential for administrative services but Prudential has also been receiving wildly excessive compensation through the massive investment in its stable value fund. This breach caused Plan losses of at least $4,000,000 per year during the relevant time period.

10.     ***Third***, whenever a Plan participant deposits or withdraws money from his/her Plan account, the money is transferred to a clearing account owned by Prudential. This is often referred to as the "float." The money is in Prudential's possession, usually for several days while, until eventually the money is directed to wherever Plan participants initially requested. Prudential invests and earns income on the Plan participant money while it is in its clearing account. Defendant agreed that Prudential could keep all the income and interest earned on Plan participant money while it is in Prudential's account.

11.     This income is referred to as "float" income. There is nothing *per se* imprudent about Defendant allowing Prudential to keep the float income. Plaintiffs are not making this allegation. Plaintiffs do allege however, Defendant never monitored, tracked, negotiated, or factored the amount of float income that Prudential was receiving from Plan participants when assessing Prudential's compensation from the Plan. In essence, Defendant allowed Prudential to make money with Plan participant money without any corresponding benefit, and Defendant was clueless to the amount of money Prudential was taking from Plan participants. This is a class breach of the duty of prudence.

12.     To the extent Defendant made any attempt to accurately identify the fair market value of the Plan's expenses, to prudently monitor and review the Plan's investment options, or identify the actual compensation received by Prudential from the Plan and its participants, Defendant employed flawed and ineffective processes, which failed to ensure that expenses charged to Plan participants were reasonable and failed to ensure the compensation received by Prudential from Plan participants was reasonable.

13.     Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary of a billion-dollar retirement plan and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

14.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

15.     This Judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because Lennar maintains its corporate headquarters in this District.

## THE PLAN

16.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

17.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

19.     Eligible current and former employees of Lennar are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former Lennar employees.  The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by Defendant.

20.     Under Section 8.01 of the Plan document, Defendant is the named fiduciary within the meaning of ERISA Section 402(a)(3)) and administrator within the meaning of ERISA Section 3(16)(A)).

21.     Defendant utilizes an Investment Committee ("the Committee") to run the Plan.

22.     More specifically, under Section 8.01 of the Plan, Defendant has delegated to the Committee the full power, authority and fiduciary responsibilities under ERISA a with respect to the day-to-day operation and administration of, and investment of assets under, the Plan, consistent with the established investment policies and the requirements of any applicable law.

## **THE PARTIES**

### ***Plaintiffs Have Both Constitutional Standing and ERISA Standing***

23.     Plaintiffs are participants in the Plan under 29 U.S.C. §1002(7).

24.     Named Plaintiff Gary Catenac is a resident of Florida. He was employed by Defendant from 2013 to 2021. He was and is a member of the Plan. He also paid Prudential excessive administrative fees during the relevant time period.

25.     Named Plaintiff Ayana Knowles is a resident of Georgia. She has been employed by Defendant since March 1, 2017.  She is a member of the Plan. Through her individual account in the Plan, she invested in the Prudential Stable Value Fund. She also paid Prudential excessive administrative fees during the relevant time period.

26.     Named Plaintiff Frank Hammond is a resident of Florida. He was employed by Defendant from October 2018 until August 2021. In approximately October of 2021, Frank Hammond cashed out of the Plan.  He is a former member of the Plan.  Through his individual account in the Plan, he invested in the Prudential Stable Value Fund. He also paid Prudential excessive administrative fees during the relevant time period.

27.     Named Plaintiff Alexander Okwali is a resident of Florida. He was employed by Defendant from November of 2018 through July of 2020. He is a former member of the Plan. In approximately July of 2020, Alexander Okwali cashed out of the Plan.  He is a former member of the Plan.  Through his individual account in the Plan, he invested in the Prudential Stable Value Fund. He also paid Prudential excessive administrative fees during the relevant time period.

28.     Named Plaintiff Harry Garcia is a resident of Florida. He was employed by Defendant from January of 2019 through December of 2019. He is a former member of the Plan. In approximately December of 2019, Harry Garcia cashed out of the Plan. He is a former member of the Plan.  Through his individual account in the Plan, he invested in the Prudential Stable Value Fund. He also paid Prudential excessive administrative fees during the relevant time period.

29.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

30.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. Indeed, if Defendant acted prudently, it would immediately correct the flaws identified in this Complaint to stop losses from continuing to occur to the Plan and its participants.

31.     Section 1132(a)(2) authorizes any Plan participant to sue derivatively as a representative of the Plan to seek relief on behalf of the Plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and the Plan remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

32.     To the extent the Plaintiffs must also show individual injuries, even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan, were invested in the stable value fund, were denied an opportunity to invest in a prudent stable value fund and were injured by Defendant's unlawful conduct.

33.     To establish constitutional Article III standing, Plaintiffs need only show an adequate injury flowing from Defendant's imprudent decisions or failures. Plaintiffs have standing because the challenged conduct, including Defendant's actions resulting

in Plaintiffs paying excessive administrative fees, and excessive compensation to Prudential, which caused Plaintiffs' financial losses and affected all Plan participants in the same way.

34.     For example, Plaintiffs' individual accounts in the Plan suffered losses because each Plaintiffs' account was assessed an excessive amount for administrative fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

35.     Not only that, Plaintiffs and all participants in the Plan suffered financial harm as a result of Defendant's inclusion of the imprudent Prudential Stable Value Fund and deprived Plan participants of the opportunity to invest in a prudent stable value fund and to grow their retirement savings by investing in a prudent stable value fund with reasonable fees. All participants continue to be harmed by the ongoing inclusion of Defendant's fiduciary breaches.

36.     As a result of Defendant's imprudence, Plaintiffs and Plan participants are entitled to restitution in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

### ***Defendant-Lennar Corporation***

37.     Lennar is the Plan sponsor and a statutory fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) it exercised discretionary authority and control over

Plan management and/or authority or control over management or disposition of Plan assets, and (c) represents to Plan participants that it is a fiduciary of the Plan.

38.     Lennar sends Plan participants annual notices wherein Lennar acknowledges that it is Plan fiduciary and that it is Lennar's fiduciary responsibility to review compensation paid to third parties (Prudential) and the costs for each investment in the Plan.

39.     At all relevant times, Lennar has maintained its corporate headquarters at 700 NW 107th Avenue, Miami, Florida 33172.

### *The Futility of Administrative Exhaustion*

40.     As a threshold matter, the exhaustion process procedure referred to in Defendant's Motion to Dismiss would have been futile because the Committee responsible for running the Plan does not have the power to make any amendments to the Plan resulting in annual increased aggregate cost to Defendant in excess of $250,000, which Plaintiffs are seeking here. *See* Plan Article VIII, 8.01 (f), and Article IX, 9.01(b). As the "Employer" under the Plan, that power lies exclusively in the hands of the Defendant, making exhaustion of the claims at issue herein futile.

41.     When a general grant of power to the Committee is limited by the allocation of a specific power to the employer, as is the case here, the natural reading of these provisions is that the Committee does not have that specific power. This reading is also consistent with principles of contractual and statutory interpretation. *See Universal Am. Mort. Co. v. Bateman*, 331 F.3d 821, 825 (11th Cir.2003) (noting that when two provisions may conflict, "the more specific will control over the general").

42.     Here, Plaintiffs are seeking to disgorge in excess of $250,000 from Defendant to return to the Plan and, also, to cause changes in the Plan that, ultimately, will cost Defendant more than $250,000 to implement.  The power to offer such significant monetary relief to the Plan, and make such significant changes to the Plan, is solely in the hands of Defendant. Therefore, a resort to the administrative exhaustion process would be futile because the Committee does not have the power to remedy Plaintiffs' perceived harm.

43.     Additionally, the purported exhaustion process Defendant contended in its Motion to Dismiss was required prior to initiating this lawsuit would be futile because this is not a "claim for benefits," and Plaintiffs have not been denied a claim for benefits within the meaning of that phrase as contemplated by the Plan.

44.     Rather, the Plan itself, has suffered injury because of the fiduciary breaches committed by Defendant described herein.  Plaintiffs, as current and former participants, are merely the vehicle by which ERISA permits the Plan to travel in when seeking to recover money, and obtain equitable relief, under and on behalf of the Plan.

45.     Not only that, but nothing under the Plan requires ***the Plan itself*** to first exhaust any administrative remedies prior to initiating suit to recover Plan losses, much less obtain equitable relief on behalf of the Plan.  Rather, the administrative exhaustion process Defendant relies on its Motion to Dismiss relates only to Plan participants, not the Plan itself.  Because this suit is brought in a representative capacity on behalf of the Plan, rather than by individual participants on behalf of their own individual interests,

the administrative exhaustion requirement argued in Defendant's Motion to Dismiss is inapplicable and, thus, futile.

46.     Finally, pausing this lawsuit for Plaintiffs to initiate and then wait the six-months' plus required for the administrative process would not lead to a resolution of the dispute or aid the court in its fact-finding, but rather, only further inflame tensions between the parties and increase litigation costs. Thus, the purposes underlying the ERISA exhaustion requirement would not be served in this case.

### *Lennar's Purported Arbitration Policy Does Not Apply*

47.     On July 19, 2022, as part of the extensive pre-litigation investigative phase of this lawsuit conducted by the undersigned, Plaintiffs' counsel reached out to Defendant and requested certain information pursuant to ERISA, Section 1024(b).

48.     Defendant responded to that request on September 15, 2022.  No mention was made of any arbitration policy.

49.     After receiving Defendant's response that made no mention of any class action waiver nor arbitration policy, Plaintiffs filed this lawsuit on October 5, 2022. (Doc. 1).

50.     A few days later, on October 10, 2022, Defendant's prior counsel then suddenly provided a letter stating that, "[p]ursuant to ERISA Section 1024(b)(4), enclosed please find the Fourth Amendment to the Plan, which was just recently executed."

51.     That document purports to amend the Plan to include a mandatory arbitration policy effective January 1, 2022 ("the Arbitration Amendment"). (*See* Doc. 14-2, pp. 2-14).

52.     However, the arbitration policy and class action waiver cannot possibly cover claims arising prior to January 1, 2022, including and especially as to claims for relief made by the Plan.

53.     Because Named Plaintiffs Frank Hammond, Alexander Okwali, and Harry Garcia, were no longer employed by nor participated in the Plan as of January 1, 2022, their claims cannot possibly be forced to arbitration.

54.     As set forth above, Named Plaintiff Frank Hammond was employed by Defendant from October 2018 until August 2021. In approximately October of 2021, Frank Hammond cashed out of the Plan.  The Arbitration Amendment was adopted after he ceased employment and after he ceased participating in the Plan.  He never assented to the Arbitration Amendment nor received any consideration to support it.  In fact, he never received a copy of it.  Thus, it is unenforceable against him.

55.     Similarly, Named Plaintiff Alexander Okwali was employed by Defendant from November of 2018 through July of 2020. He is a former member of the Plan. In approximately July of 2020, Alexander Okwali cashed out of the Plan.  The Arbitration Amendment was adopted after he ceased employment and after he ceased participating in the Plan.  He never assented to the Arbitration Amendment nor received any consideration to support it.  In fact, he never received a copy of it.  Thus, it is unenforceable against him.

56.    Likewise, Harry Garcia was employed by Defendant from January of 2019 through December of 2019. He is a former member of the Plan. In approximately December of 2019, Harry Garcia cashed out of the Plan.  The Arbitration Amendment was adopted after he ceased employment and after he ceased participating in the Plan. He never assented to the Arbitration Amendment nor received any consideration to support it.  In fact, he never received a copy of it.  Thus, it is unenforceable against him.

57.    Beyond the failed timing of Defendant's attempt to force this case into arbitration, none of the Named Plaintiffs in this case—Gary Catenac, Ayana Knowles, Frank Hammond, Alexander Okwali, and Harry Garcia, cannot be compelled to arbitrate this case because the claims they seek to adjudicate are brought on behalf of the Plan pursuant to § 502(a)(2) of ERISA.

58.    Simply put, the § 502(a)(2) claims at issue in this lawsuit belong to the Plan, not to Plaintiffs, and the Plan is not party to nor required to abide by the Arbitration Amendment.   As the Sixth Circuit recently explained, "it is the plan that takes legal claim to the recovery, suggesting that the claim really 'belongs' to the Plan. And because § 502(a)(2) claims 'belong' to the Plan, an arbitration agreement that binds only individual participants cannot bring such claims into arbitration." *Hawkins v. Cintas Corp.*, 32 F.4th 625, 633 (6th Cir. 2022), cert. denied, No. 22-226, 2023 WL 124031 (U.S. Jan. 9, 2023).

59.    Additionally, an exception exists as to the Federal Arbitration Act's ("FAA") general policy of enforcing arbitration agreements for situations, like this, when a Plaintiffs' statutory rights cannot be vindicated in arbitration.

60.    Because Defendant's Arbitration Amendment provision improperly prohibits Plaintiffs from seeking or receiving relief in arbitration that has the purpose or effect of providing Plan-wide benefits, including disgorgement, reformation of the Plan, and the removal and replacement of the Plan's fiduciaries (all of which are sought in Plaintiffs' below prayer for relief), Defendant's Arbitration Amendment does not apply.

## CLASS ACTION ALLEGATIONS

61.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[2] All persons, who were participants in or beneficiaries of the Plan, at any time between September 30, 2016, and the present (the "Class Period").

62.    The members of the Class are so numerous that joinder of all members is impractical. As of December 31, 2021, the Plan had 14,412 participants with account balances. The Plan is one of the largest plans in the country. It is considered a jumbo or mega plan.

63.    Plaintiffs' claims are typical of the claims of Class members. Like other Class members, Plaintiffs participated in the Plan and suffered injuries because of Defendant's imprudence. Defendant treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant

---

[2] Plaintiffs reserve the right to revise the proposed class definition in his motion for class certification or subsequent pleadings in this action.

as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

64.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendant is a fiduciary of the Plan;

B.     Whether Defendant breached its fiduciary duties of prudence by engaging in the conduct described herein;

C.     Whether Defendant failed to adequately monitor Prudential's compensation to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of all relief.

65.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

66.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate

actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

67.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANT'S FIDUCIARY BREACHES

68.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

69.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

70.     As described above, Defendant was (and still is a) fiduciary of the Plan because Lennar:

> A.     is so named; and/or
>
> B.     exercised authority or control respecting management or disposition of the Plan's assets; and/or
>
> C.     exercised discretionary authority or discretionary control respecting management of the Plan's fess, expenses, and compensation paid to Prudential; and/or
>
> D.     has discretionary authority or discretionary responsibility in the administration of the Plan.

71.     As a fiduciary, Defendant was/is required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan's fees and expenses, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

72.     "In deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *U.S. Dep't of Labor ERISA Adv. Op.* 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

73.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

74.     During the Class Period, Defendant did not act prudently or in the best interests of the Plan's participants.

75.     During the Class Period, Defendant failed to have a proper system in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for administrative services. Defendant also caused the Plan and its participants to pay excessive compensation to Prudential via its stable value fund and receipt of float income. Not only did Defendant fail to have a proper system in place, but Defendant failed to control fees and compensation as a prudent fiduciary would have done.

76.     As set forth in detail below, Defendant breached fiduciary duties to the Plan and its participants and beneficiaries, and is, therefore, liable for their breaches under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS
### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

77.     Wasting Plan participant retirement savings is imprudent. "In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

78.     "The Restatement…instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[3]

79.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[4] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors, whether due to poor performance, high fees, or both.

---

[3] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 11, 2023).
[4] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited January 11, 2023).

80.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and to "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

81.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[5] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

82.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from services like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[6]

---

[5] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited January 11, 2023).
[6] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited January 11, 2023).

### *Defendant Failed to Monitor or Control the*
### *Plan's Administrative Expenses*

83.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

84.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, recordkeepers vigorously compete for business by offering the best price.

85.     The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

86.     Recordkeeping expenses can be paid directly from plan assets, or indirectly by taking money from plan participants' individual accounts (or a combination of both).

87.     In a typical "direct" recordkeeping fee arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based

on the number of participants for which the recordkeeper will be providing services – for example, $25.00 per year, per plan participant.

88.     A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

89.     By way of illustration, a plan with 16,000 participants and $2 billion in assets may issue a request for proposal to several recordkeepers and request that the recordkeepers provide pricing based on a flat rate for a 16,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $25.00 per participant, per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $400,000 direct annual fee (16,000 participants at $25.00 per participant). If the plan's assets double and increase to $4 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not double as the plan assets did.

90.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $25.00 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per participant rate of $25.00 per

participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.024% of his or her account balance annually for recordkeeping ($400,000/$2,000,000,000 = 0.0002). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $400,000 price that was negotiated at the plan level for services to be provided to the plan.

91.     Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar-per-head and asset-based approaches. Plaintiffs here are specifically not alleging that NCR was required to use a direct payment arrangement – or any specific payment arrangement for that matter. Rather, Plaintiffs are simply providing details on how direct payment methods operate and provides these details to partially illustrate (together with all the allegations herein) that the recordkeeper fees the Plan participants are paying are excessive and that NCR should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan.

92.     Defendant failed to prudently manage and control the Plan's recordkeeping fees by failing to undertake any of the aforementioned steps.

93.     Prudential has been the Plan's recordkeepers during the Class Period.

94.     From 2017 to 2021 the direct annual recordkeeping and administrative costs per participant compensation that Prudential received from Plan participants,

referred to as "direct compensation, was disclosed in the Plan's Department of Labor annual 5500 disclosures was as follows:

- $385,002 for the year 2017 during which there were 9,369 Plan participants with active account balances—equivalent to $41.09 per participant annually;

- $655,268 for the year 2018 during which there were 13,537 Plan participants with active account balances—equivalent to $48.40 per participant annually;

- $723,319 for the year 2019 during which there were 13,559 Plan participants with active account balances—equivalent to $53.34 per participant annually;

- $684,916 for the year 2020 during which there were 12,958 Plan participants with active account balances—equivalent to $52.86 per participant annually;

- $683,313 for the year 2021 during which there were 14,412 Plan participants with active account balances—equivalent to $47.41 per participant annually;

95.     The above amounts of direct compensation paid to Prudential are, by themselves excessive, for the recordkeeping and administrative services Prudential performed for the Plan, as demonstrated herein.

96.     But there's more evidence of the excessive administrative fees Defendant caused the Plan to pay.  In fact, Defendant disclosed to Plan participants in the Plan's Summary Plan Description, dated January 1, 2021, that a "Basic Administrative Charge" in the amount of $100.00 is deducted quarterly from Plan participants with account balances in excess of $2,500.00. A screenshot from that document is included below:

**Explanation of fees and expenses for general plan administrative services:**

| Fee Type | Fee Amount | Frequency |
|---|---|---|
| Basic Administration Charge | $100.00 | Annual amount deducted quarterly. May only apply to some participants |
| Company Stock Trading Fee | $0.04 | per share of company stock traded |
| Distribution Transaction Processing | $30.00 | Per applicable transaction |
| DSO Account Maintenance Charge | $100.00 | Annual amount deducted quarterly. May only apply to some participants |
| DSO Withdrawal Charge | $30.00 | Per applicable transaction |
| Express Mail Fee | $25.00 | Per applicable transaction |
| Installment Payout Charge | $5.00 | Per applicable transaction |
| Loan Processing Fee | $35.00 | Per applicable transaction |

97. Thus, according to Defendant's own internal documents, Plan participants paid at least $100 annually in direct compensation for recordkeeping and administrative services, including as to the direct amounts paid to Prudential, which is patently excessive.

98. These amounts do not include indirect compensation that Prudential receives from the Plan via revenue sharing, float, spread, etc. By comparison to other plans, even Prudential's direct fees are excessive and unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan) and provides the

average recordkeeping and administration cost (through direct compensation) is $12 per participant. 401k Averages Book at 95.

99.     Just recently, in *Moitoso v. FMP LLC*, the parties involved in that case came to an agreement that if Fidelity Management Trust Company (one of the largest recordkeepers for retirement plans) were a negotiating recordkeeping fees at arm's length for a plan of $1 billion or more, that recordkeeping costs would range from $14 to $21 per person per year.[7]

100.    The direct compensation Prudential received from the Plan for recordkeeping was excessive. Moreover, Prudential did not receive only the direct compensation set forth above—it received far more compensation for recordkeeping and other administrative services through indirect compensation, including revenue sharing payments.

101.    According to Plan's Department of Labor Form 5500's, Plan participants paid to Prudential both disclosed direct payments for recordkeeping services and *undisclosed* payments for recordkeeping services.  Specifically, the Plan paid substantial amounts through revenue sharing arrangements with the various fund families through which the Plan offers investment options. *See* Form 5500 for 2021, Schedule C (reporting only that Prudential received indirect compensation without disclosing the amounts of such compensation).

---

[7] *Moitoso v. FMR LLC,* Civil Action 18-12122-WGY (US Dist. of Mass.) decided Mar 27, 2020.

102.    Notably, Defendant's Annual Form 5500 Reports (mandatory Department of Labor disclosures) do not disclose the amount of any indirect fees Prudential collects, but it does disclose that Prudential receives such fees, as evidenced by the following screenshot:

PRUDENTIAL RETIREMENT INSURANCE AND

06-1050034

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 13 14 15 37 50 64 | NONE | 683313 | Yes ☒  No ☐ | Yes ☒  No ☐ | 0 | Yes ☒  No ☐ |

103.    As discussed below, the indirect compensation Prudential received derives not only from revenue sharing but also from float and spread compensation. Defendant has breached its fiduciary duties of prudence by allowing Prudential to pocket excessive fees from throughout the Class Period.

104.    As set forth above about the "float," Defendant agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a Prudential clearing account.

105.    Defendant agreed Prudential could keep all the interest and investment related revenue earned on Plan participant money while participant money is in Prudential's clearing account (often for several days). This is another form of indirect compensation that Prudential receives from the Plan. Because there is over $1.3 billion in the Plan, the float compensation Prudential receives from the Plan is substantial. The

Plan's 2021 5500 provides that there were $89,402,612 in contributions to the Plan in 2021, and $99,242,123 in expenses, or money paid out of the Plan in 2021. Thus, in 2021 alone, Prudential earned interest and investment related revenue on more than $188,644,735 ($188 million) of Plan participant money while the money was in Prudential's account. But Defendant did not take any measures to understand, account for, negotiate, limit, or end altogether this compensation. A prudent fiduciary is required to do so under ERISA. Defendant's imprudence caused the Plan losses. Had Prudential earned 1% on the $188,000,000 it would have pocketed $1,880,000 ($1.88 million) in 2021 alone from float alone. The numbers are staggering.

106.    Defendant breached its fiduciary duties of prudence by allowing Prudential to receive float compensation from Plan participants without even knowing the amount of such compensation or factoring in the amount of such compensation into the total amount of compensation Defendant agreed Lennar could take from Plan participant retirement savings.

107.    The total compensation Defendant allowed the Plan to pay Prudential is far greater than recognized reasonable compensation for a plan with more than $1.3 billion in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower plan administrative expenses in the marketplace as a whole, the Plan could have obtained administrative services that were comparable to or superior to the services provided to the Plan by Prudential but at a fraction of the cost to Plan participants.

108.    Prudential performs task for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.) The services that Prudential provides are nothing out of the ordinary, and a prudent fiduciary would have observed the excessive compensation paid to Prudential and taken corrective action.

109.    Looking at administrative costs for other plans of a similar size shows that the Plan was paying higher fees than its peers too – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. The chart[8] below analyzes a few well managed similar plans:

| Plan Name | Record-keeper | Total # participants w/ account balances | Dollar value of plan assets | Total reported recordkeeping and administrative service costs paid to Fidelity in 2021 | Recordkeeping and administrative service costs per-participant basis[9] | Service codes |
|---|---|---|---|---|---|---|
| Lennar Corp. 401(k) Plan | Prudential | 14,412 | $1,391,467,950 | $683,313 | $47.41 | 13,14, 15, 37,50, 64 |

---

[8] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2021, which are the most recent years for which many plans' Form 5500s are currently available.

[9] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2021) at pg. 29 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf.

| Parsons Corp. Retirement Savings Plan | Prudential | 13,857 | $1,950,803,322 | $345,582 | $24.93 | 13, 37, 50, 64 |
| ZF North America, Inc. 401(k) Savings Plan | Fidelity | 12,621 | $1,222,844,809 | $231,287 | $18.32 | 37, 60, 64, 65, 71 |
| Discount Tire/America's Tire Retirement Plan | Great-West Life (part of Prudential) | 14,563 | $1,040,215,692 | $75,000 | $5.15 | 15,37, 50, 64 |

110.    Importantly, the above benchmarking compares only fees paid to the above three plans' recordkeepers only as to direct compensation paid to similar plans' recordkeepers. Thus, Defendant caused its Plan to pay Prudential excessive fees for basically the same services that the other recordkeepers offered, two of which are plans that either used Prudential (Parsons Corp.), or a Prudential-related company known as Great-West Life (Discount Tire). These examples are illustrative and not exhaustive. Plaintiffs anticipate expert witness reports will expand on the benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable fees.

111.    The Annual Form 5500 Reports from these various plans also demonstrate that, in fact, many of the recordkeeping services offered by Prudential to the Plan here are/were similar to the above comparator plans. In fact, they are nearly identical, but done for $25 or less, per participant, annually.

112. For example, the service codes from the 5500 for the Lennar 401(k) Plan from 2021 indicate that Prudential performed the following discrete activities in 2021 for which it collected fees in the form of direct compensation: contract administrator (code "13"); plan administrator (code "14"); recordkeeping and information management (code "15"); participant loan processing (code "37"); direct payment from the plan (code "50"); recordkeeping (service code "64"). These services codes explain how and why Prudential was paid for the recordkeeping and administrative services it performed for the Lennar Plan. Those same service codes can also be used to compare plans of similar participant and asset size.

113. By way of comparison, according to the Form 5500s filed by the Parsons Corp. Retirement Savings Plan ("the Parsons Plan") for the year 2021, Prudential performed nearly the same services for both the Parsons Plan and the Lennar Plan, but Defendant permitted Prudential to charge the Lennar Plan nearly twice as much. That means the Lennar Plan could have saved nearly $2 million had Defendant negotiated the same or similar deal with Prudential that the Parsons Plan got over the six year class period.

114. More specifically, both the Parsons Plan and the Lennar Plan share four of six service codes used to describe the services Prudential performed for each plan, including: contract administrator (code "13"); participant loan processing (service code "37"); sub-transfer agency (service code "60"); and, most importantly, recordkeeping (service code "64"). Each Plan is also of similar size in terms of participants (between 13,000-15,000 with account balances in 2021), and assets (between $1.3-$1.9 billion).

115.    However, participants in the Parsons Plan paid only $24.93 annually to Prudential in direct compensation while participants in the Lennar Plan paid nearly twice that ($47.41), also to Prudential, in direct compensation.

116.    Much of the same is true for the other two comparator plans identified above, the ZF North America, Inc. 401(k) Savings Plan ("ZF Plan"), and the Discount Tire/America's Tire Retirement Plan ("Discount Tire Plan").

117.    Beginning with the Discount Tire Plan, the service codes from the Discount Tire Plan's Annual 5500 Report indicate that its recordkeeper, Great West, performed basically the same work for the Discount Tire Plan that Prudential performed for the Lennar Plan.  This is demonstrated using the 5500-service codes 15, 37, 50, and 64, and 65 by both the Lennar Plan and the Discount Tire Plan when describing the kind of services provided and the type of compensation received by the respective recordkeepers for the work they performed on behalf of the two comparable plans.   Notably, the Plans have nearly the exact same number of participants (Lennar - 14,412 participants vs. Discount Tire - 14,563), and comparable assets under management (Lennar - $1.3 billion vs. Discount Tire - $1.04 billion).

118.    The only real substantive difference is that the Defendant from this case caused the Lennar Plan to pay about $47.41 annually per participant for the services, whereas the Discount Tire Plan paid only $5.15 annually per participant.  Over six years, the difference amounts to the Lennar Plan paying approximately $3,645,000 more than the Discount Tire Plan paid for basically the same recordkeeping and administrative services.

119.    The same is also true for the other comparator plan, the ZF Plan.  The plans are of similar size in terms of assets and participants. Not only that, a comparison of the services codes found in the two plans' Form 5500s demonstrates that the recordkeeping and administrative services work Prudential did for the Lennar Plan was basically the recordkeeping and administrative work Fidelity did on behalf of the ZF Plan.  In fact, both share the same two core service codes 37 (participant loan processing), and 64 (recordkeeping).  However, Defendant caused the Lennar Plan's participants to pay more than 2.5 times what ZF Plan participants paid for the same work performed for the same-sized plan.

120.    Simply put, each of the above plans are comparable because the plans are of similar size in both participants and assets and, more importantly, because the recordkeepers performed nearly identical services for each plan. Thus, based on the comparator plans, if the Lennar Plan were a standalone plan, with over 14,000 participants and over $1.3 billion in assets under management in 2021, Defendant should have been able to negotiate a <u>total</u> recordkeeping fee of $25 per year, per participant, at most, from the beginning of the Class Period to the present.

121.    As demonstrated by these benchmarks, considering that the recordkeeping services provided by Prudential in this case were and remain similar to those provided by all national recordkeepers, Defendant's decision to cause the Plan and its participants to pay at least between $41 to $53 in direct compensation to Prudential during the Class Period, is both imprudent and in violation of ERISA.

122.    Based on the above table of comparator plans of approximately equivalent size and assets, Defendant should have been able to negotiate a ***total*** recordkeeping cost anywhere from $5 per participant to $30 from the beginning of the Class Period to the present. Instead, Plan participants are paying Prudential in excess of $250 via direct and indirect forms of compensation.

123.    In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower administrative expenses in the marketplace, Defendant could have obtained for the Plan administrative services that were comparable to or superior to the typical services provided by Prudential at a lower cost.  Defendant failed to do so and, as a result, violated its fiduciary duties under ERISA.

### ***Prudential Stable Value Fund***

124.    Stable value funds are a staple of defined contribution plans. They provide liquidity, principal protection, and consistent returns over time.

125.    Stable value funds are intended to provide the liquidity and principal protection of a money market fund, but with higher returns that are closer to short-intermediate bond funds.

126.    Stable value funds can generate these higher returns because 401(k) participant behavior provides a stable amount of money to be invested in the account over time. This enables funds providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by guaranteeing the funds transacts at face value. Stable value funds also "stabilize" the returns using an imbedded formula

which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with bond funds.[10]

127.    In most cases, stable value products use a guaranteed investment contracts also known as "GICS" or "wraps" that have specialized risk and return characteristics.[11] In most cases, stable value funds are not mutual funds and are typically structured as: (1) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic account.

128.    Large plans often offer synthetic accounts, which are the least risky because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.[12]

129.    Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider. As a result, they offer higher crediting rates. Separate account products, such as the Prudential PPSA, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently must offer the highest rates.

---

[10] *See Stable Value Fund v. Money Market Fund,* Financial Web describing difference between stable value funds and money market funds, available at http://www.finweb.com/investing/stable-value-fund-vs-moeny-market-fund.html#axzz44-EaLfQnQ.

[11] *See* https://stablevalue.org/knowledge/faqs/question/what-are-gics-and-wraps.

[12] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relied on both the value of the associated assets and the financial backing of the wrap provider.

130.    Following the high-profile failure or near failure of several stable value providers during the credit crisis of 2008-09, the trend among fiduciaries is to avoid general account stable value funds because of credit risk concerns.

131.    During the Class Period, the Plan offered one stable value product, the Prudential Stable Value Fund.

132.    The Prudential Stable Value Fund is a general account product established pursuant to a contract between Lennar and Prudential. The invested funds are deposited by Prudential into its general account.

133.    Thus, the Prudential Stable Value Fund is subject to a single entity credit risk, of Prudential, the issuer of the contract.

134.    The crediting rate – set in advance by Prudential at its sole discretion – is not tied to the performance of the assets deposited into the Principal Stable Value Fund.

135.    Because the crediting rate is set in advance, Defendant has both the opportunity and the duty to evaluate the investment in advance.

136.    The fact that the funds are deposited into Prudential's general account enables Prudential to earn a "spread" equal to the difference between the crediting rate and the returns earned by Prudential from the general account funds.

137.    Prudential earns a "spread" equal to the difference between the 0.00-2.34%. 2.08%. The average return for Plan participants invested in the Prudential Stable Value Fund is 1.57% over the past one year, and 2.08% over the past 3 years. The average return over the past month is .11%.

138.    Defendant does not require Prudential to provide information regarding the performance of the general account into which the Plan participants' funds were invested.

139.    In addition, Defendant does not require Prudential to disclose the "spread" to either the Plan or to the participants.

140.    Thus, neither Defendant nor the Plan participants know the "spread" on Plan participant money being collected by Prudential.

141.    Upon information and belief, the spread was consistently 400 basis points or more.

142.    That is, Prudential is collecting, and participants are paying, a 4% fee to obtain a return of .11%-2.08% on their investments.

143.    Defendant's 403(b) Disclosure fails to provide benchmark information for the Prudential Stable Value Fund too. As a result, participants cannot evaluate the performance of the Prudential Stable Value Fund relative to other stable value funds that are available in the marketplace.

144.    The Prudential Stable Value Fund contractually allows Prudential to pay Plan participants invested in the fund no return. It is a "heads I win, tails you lose" investment vehicle for Prudential.

145.    Lennar did not have a viable methodology for monitoring the cost or performance of the Prudential stable Value Fund. Not only were comparable products available from other providers (New York Life, Vanguard, TIAA, Putnam, etc.) with higher crediting rates, but virtually identical products were available from Prudential

itself with higher crediting rates and lower spread fees. In fact, the Prudential Stable Value Fund consistently returned 200 basis points less than the ***very same*** type of fund offered by Prudential to other similarly situated retirement plans. By way of ***one example***, attached hereto as Exhibit A is Fact Sheet for the "Lennar" Prudential Stable Value Fund. The Fact Sheet shows the fund has a current crediting rate of 1.28%. Attached hereto as Exhibit B, is a Fact Sheet for a Prudential stable value fund generally available to the public. Exhibit B shows essentially the same fund is being offered with a crediting rate of 2.43% -- or nearly double the crediting rate of what is in the Plan.

146.    Lennar did not have to scour the marketplace to find a better performing fund, it simply had to make an effort, which it failed to make, to determine whether the same fund was available at a lower cost. Fact sheets showing the available crediting rates of market rate Prudential stable value funds (Exhibit A) and similar products from other providers were readily available had Lennar exercised even a minimal amount of due diligence.

147.    There is more than $200,000,000 ($200 million) of Plan participant money invested in the Prudential Stable Value Fund. There is more Plan participant money in the Prudential Stable Value Fund than any other investment on the Plan's investment menu.

148.    The amount of money in the Prudential Stable Value Fund is a direct result of Defendant's use of a Prudential asset allocation service called "GoalMaker."

149.    GoalMaker was represented by Defendant to participants as a service that would guide and assist participants to a model portfolio of investments available in the

Plan and then rebalance accounts quarterly to ensure participants investment portfolios stay on target.

150.    But, in reality, GoalMaker is used to funnel money into Prudential proprietary investment products. Hence, the reason why there is more than $200 million of Plan participant money invested in the Prudential Stable Value Fund. Indeed, in some instances, GoalMaker allocates 44% of all contributions in Plan participants' accounts into the Prudential Stable Value Fund.

151.    To make matters worse, Defendant selected GoalMaker to be the Qualified Default Investment Alternative ("QDIA") for the Plan. That means whenever a Plan participant does not affirmatively elect how to invest new contributions to his/her account, GoalMaker will allocate the funds to investments selected by GoalMaker, primarily, Prudential proprietary funds like the Prudential Stable Value Fund.

152.    There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere. Because the product's performance over a given period is declared six months in advance, the plan fiduciary knows six months in advance what the returns will be.

153.    The plan fiduciary also knows that, because of the way crediting rates are calculated, the product is less sensitive to interest rates than bond funds. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as the Prudential Stable Value Fund, generally continues to perform poorly in a stable manner.

154.     A prudent fiduciary – that is, a fiduciary that monitors the investment, understands the pricing mechanism, and informs itself of the crediting rates and spread fees available in the market – would have known that Prudential's stable value product would underperform and that being a stable value product it would continue to underperform in a stable manner.

155.     A prudent fiduciary would have monitored the investment, understood the pricing mechanism, and informed itself regarding reasonable market rate crediting rates and spread fees.

156.     A prudent fiduciary would have learned that the Prudential Stable Value Fund was under-performing and divested the Plan of the Prudential Stable Value Fund.

157.     The consequence of failing to monitor the stable value product was particularly significant here. Prudential, the stable value provider, was also the investment platform provider and the supplier of GoalMaker, which Prudential applied in a self-dealing manner to steer Plan participants to proprietary Prudential products and products paying kickbacks to Prudential. General account stable value funds can be tremendously profitable for the issuing insurance company because of the spread. The excessive spread in this case resulted in a windfall to Prudential, whose compensation Lennar had a legal duty to monitor, but which duty Lennar failed to discharge in spectacular fashion.

158.     Based on the excessive spread fees alone, the Prudential Stable Value Fund was an imprudent investment which should have been removed from the Plan.

## CLAIM FOR RELIEF
### _Breach of ERISA's Fiduciary Duty of Prudence_

159. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

160. The scope of the fiduciary duties and responsibilities of Lennar includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Lennar is directly responsible for ensuring that the Plan's fees are reasonable, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. To do so, Lennar had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses.

161. As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" _Tibble_, 135 S. Ct. at 1829.

162. Thus, to state a claim upon which relief can be granted, "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." _Id._

163. Lennar failed to implement a prudent process of the selection, monitoring, and retention or, as the case may be, removal of the Prudential Stable Value Fund.

164.     Lennar also failed to prudently monitor and control the total compensation Plan participants paid Prudential for administrative services.

165.     Lennar failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

166.     Lennar breached its fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B). Lennar is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duty of prudence and is subject to other equitable or remedial relief as appropriate.

167.     Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1.     Find and declare that the Defendant has breached its fiduciary duties as described above;

2.      Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.      Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to include only prudent investments;

8.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

9.      Certify the Class, appoint the Plaintiffs as class representatives, and appoint their counsel as Class Counsel;

10.     Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11.     Order the payment of interest to the extent it is allowed by law; and

12.     Grant other equitable or remedial relief as the Court deems appropriate.

Dated this 12th day of January 2023.

Respectfully submitted,

*/s/ Brandon J. Hill*
**BRANDON J. HILL**
Florida Bar Number: 0037061
Direct Dial: 813-337-7992
**LUIS A. CABASSA**
Florida Bar Number: 053643
Direct No.: 813-379-2565
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
Direct Dial: 813-379-2560
**WENZEL FENTON CABASSA, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main Number: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com
Email: gnichols@wfclaw.com

**and**

**MARC R. EDELMAN**
Florida Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: 813-223-5505
Facsimile: 813-257-0572
Email: medelman@forthepeople.com

***Attorneys for Plaintiffs and the Proposed Class***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** on the 12th day of January, 2023, a true and correct copy of the foregoing was electronically filed with the Clerk of Court via the CM/ECF system which will send an electronic notice to all counsel of record.

/s/ Brandon J. Hill
**BRANDON J. HILL**